1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
2               FORT LAUDERDALE DIVISION
                 CASE NO. 24-MJ-02454
3

4    UNITED STATES OF AMERICA,          Miami, Florida

5                                       March 15, 2024
              vs.
6                                       10:38 AM - 12:02 PM

7    MICHAEL DULFO,

8          Defendant.                   Pages 1 to 60

9    _____

           TRANSCRIPT OF RECORDED HEARING
10     BEFORE THE HONORABLE JARED M. STRAUSS
           UNITED STATES MAGISTRATE JUDGE
11
     APPEARANCES:
12

13   FOR THE GOVERNMENT:          Brian Dobbins, Esquire
                                   U.S. Attorney's Office
14                                 99 Northeast 4th Street
                                   Miami, Florida 33132
15

16   FOR THE DEFENDANT:           Eboni Blenman, Esquire
                                   Assistant Federal Public
17                                 Defender
                                   150 W. Flagler Street
18                                 Suite 1700
                                   Miami, Florida 33130
19
     STENOGRAPHICALLY TRANSCRIBED BY:
20

21                  AMBER GABEL, CR
                    Bailey-Entin Reporting, LLC
22

23

24

25

```
 1                          I N D E X

 2   WITNESS:                                      PAGE:

 3        FBI OFFICER DARELL RODRIGUEZ
     CROSS-EXAMINATION BY MS. BLENMAN:              12
 4   REDIRECT EXAMINATION BY MR. DOBBINS:           26

 5

 6                        -   -   -

 7            N O   E X H I B I T S   M A R K E D

 8                        -   -   -

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (Call to the Order of the Court.)
 2
 3           THE COURT:  And can I please have appearances from both
 4   parties, starting with the Government.
 5           MR. DOBBINS:  Good morning again, Your Honor.  Brian
 6   Dobbins on behalf of the United States.
 7           THE COURT:  Good morning, Mr. Dobbins.
 8           MS. BLENMAN:  Good morning, Judge.  Eboni Blenman,
 9   assistant federal defender on behalf of Mr. Howard, who is
10   present before the Court.
11           THE COURT:  Good morning.
12           I'm sorry.  Can you just give me your name one more
13   time.
14           MS. BLENMAN:  Sure.  It's Eboni, last name Blenman.
15           THE COURT:  Blenman.
16           MS. BLENMAN:  Yes.
17           THE COURT:  Thank you, Ms. Blenman.
18           If you'll just give me one second, please.
19           Okay.  We are here for a pretrial detention hearing.
20           Are both parties ready to proceed?
21           MR. DOBBINS:  Yes, Your Honor.
22           MS. BLENMAN:  Yes, Your Honor.
23           THE COURT:  So, Mr. Dobbins, if you can please start by
24   telling me on what basis the Government is seeking pretrial
25   detention.
```

1          MR. DOBBINS:  Yes, Your Honor.

2          We're seeking pretrial detention based on risk of

3     flight and danger to the community.  There is a rebuttal

4     statutory presumption as to the arson charge in 844(i) under

5     3142(e)(3)(c) as to this defendant.

6          THE COURT:  All right.  Can you tell me what are the

7     maximum possible penalties if convicted.

8          MR. DOBBINS:  Yes, Your Honor.

9          On the -- the maximum penalty for 18 U.S.C. 844(i),

10    which is the arson, is ten years statutory max.  On 18 U.S.C.

11    1952, which is the use of interstate facility in aid of

12    racketeering with a crime of violence, the maximum is 20 years.

13    The 2261A charge, which is stalking, is a maximum of ten years,

14    and the arson charge with 844(h) actually are statutory

15    sentences of 10 years and 20 years for the second offense.  So

16    those are consecutive sentences to be applied.

17         THE COURT:  So I'm sorry.  The 844(h) carries a

18    mandatory minimum?  Is that --

19         MR. DOBBINS:  That's correct, Your Honor.

20         And it's the same for the maximum, though.  It's just

21    10 years for the first offense and 20 years for the -- for any

22    subsequent.

23         THE COURT:  I see.  So there's no -- both the minimum

24    and maximum are the same.  It's just a dictated sentence.

25         MR. DOBBINS:  That's correct, Your Honor.

```
 1          THE COURT:  And do you have any estimate of the -- I'm

 2    sorry.  And those are consecutive sentences to the other counts

 3    or, I guess, does it work the same way 924(c) does?  It --

 4          MR. DOBBINS:  I believe it functions in the same way as

 5    a 924(c), Your Honor.

 6          THE COURT:  Does the Government have an estimated

 7    guideline range?

 8          MR. DOBBINS:  So on the underlying charges before

 9    applying 844(h), we have him coming out roughly at around

10    somewhere between 57 to 71 months, possibly higher.  But then

11    if you assign the other mandatory minimums under 844(h), you

12    would be looking at least a 30-year sentence, five years plus

13    30.

14          THE COURT:  All right.  Is the Government going to

15    proceed by proffer?

16          MR. DOBBINS:  Yes, Your Honor.

17          THE COURT:  Who is the witness you have available for

18    cross-examination?

19          MR. DOBBINS:  We have FBI Task Force Officer Darell

20    Rodriguez.

21          THE COURT:  So, Mr. Dobbins, why don't you proceed with

22    your proffer, please.

23          MR. DOBBINS:  Yes, Your Honor.

24          So, Judge, this case came about as part of an

25    investigation where Victim 1 -- we labeled them as Victim 1 and
```

1    Victim 2 in this case.

2         Victim 1 was driving home from the court proceeding,

3    and when she pulled into her driveway, a Home Depot truck that

4    was rented, which was a rental flat bed truck that can you rent

5    from Home Depot, had been parked across the street, put the

6    truck in reverse, and as she's pulling into the driveway,

7    circled around and rammed her car with that Home Depot truck.

8    The way that that was done, it's clear that it was intentional

9    and not some sort of accident.

10        There was surveillance camera footage, home security

11   footage that caught the incident on tape.  Based on that, law

12   enforcement began investigating why this had happened.  And

13   when they interviewed Victim 1, they also learned that Victim

14   1's sister and brother-in-law -- we'll collectively refer to as

15   Victim 2 -- had had a sequence of arsons that had occurred at

16   their residence.  One of those arsons occurred on July 2nd of

17   2022, where both of their vehicles were fire bombed.  Both of

18   those vehicles are used in their business, which is an

19   interstate commerce.  The brother-in-law's vehicle,

20   specifically, he's a salesperson for a global construction

21   supply company.  And the sister works in sales as well, and

22   uses the vehicle for that.

23        So the first arson occurred on July 2nd of 2022.  The

24   second arson occurs on August 12th of 2023, and then the

25   ramming incident with Home Depot truck occurred on August 30th

1   of 2023.

2         Law enforcement was able to do some research and locate

3   a Home Depot truck had been reported stolen from the Coconut

4   Grove Home Depot located at 32nd Avenue and US-1.  They were

5   able to obtain the security footage of who rented that vehicle

6   as well as observing that the person that rented that vehicle

7   is -- at the same time that they were renting that vehicle,

8   codefendant, Edner Etienne, had entered the Home Depot.  They

9   were able to obtain the security footage from the parking lot,

10  and what they observed is that the renter pulled up to the Home

11  Depot parking in a Tesla and at the same time, a truck, that

12  was later identified as Mr. Dulfo's, Silverado truck, pulled in

13  across in a parking spot near where the Tesla parked.

14        At the time, the individual who rents the truck goes

15  into the Home Depot.  Mr. Etienne gets out of the passenger

16  side of the truck and enters the Home Depot shortly after.

17        After the person rents the truck, they come out.  They

18  have a conversation with the somebody in the Silverado truck.

19  Mr. Etienne also returns and gets back in the Silverado truck.

20  Then, the person in the Tesla gets in and drives away.  The

21  Silverado truck then proceeds over towards where the rental

22  trucks are kept, and an individual gets out of that truck, and

23  then shortly after that, the Silverado takes off followed by a

24  Home Depot truck.

25        We were able to obtain from Home Depot GPS coordinates

1    that they have for the truck, which indicated that the truck

2    came to the downtown area where Victim 1 had been making a

3    court appearance and sat there for quite some time before

4    appearing to follow Victim 1 towards her residence in Pine

5    Crest, Florida, where the ramming occurred.

6            Based on that and the identification of Mr. Etienne,

7    law enforcement went up towards Mr. Etienne's house where they

8    located a Home Depot rental truck that matched what had been

9    rented from the Coconut Grove stop with paint scratches from --

10   that were consistent on the rear of the truck that are

11   consistent with ramming Victim 1's vehicle.

12           Based on that, we began researching Mr. Dulfo.  And we

13   started by getting -- identifying his cell phone and obtaining

14   cell site records for him.  What we learned was that on

15   August 30th of 2023, obviously, his cell phone was indicating

16   that he was in the area of that Coconut Grove Home Depot as

17   well as following Victim 1 -- it appeared to be following the

18   same pattern Victim 1 was following when she departed the

19   downtown area to head back to her residence.

20           Also, we obtained -- at that point, we obtained toll

21   records that indicated that Dulfo was in contact with the

22   Mr. Howard.  The cell that was associated, we found out -- we

23   identified with Mr. Howard, and we identified that he had

24   numerous contacts with Mr. Howard.

25           Based on that, we also obtained surveillance -- or home

9

1    security footage and surveillance from the date of the second

2    arson, which indicated that which showed that around the time

3    that the arson occurred, we had sightings of the -- Mr. Dulfo's

4    Silverado truck in the area of Victim 2's residence in Miami at

5    about that time that the second arson occurred on August 12,

6    2023.

7        Based on that, we also obtained a search warrant for

8    Mr. Dulfo's iCloud accounts, which showed numerous contacts

9    between Mr. Dulfo, Mr. Howard, as well as contacts between

10   Mr. Dulfo and Mr. Etienne, including a Cash App payment that

11   occurred on the date of the ramming of $200, and then an

12   attempted Cash App payment to Mr. Etienne on the date of the

13   ramming in the amount of $800.

14       What we did, then, was we located -- we did historical

15   cell site warrants for Mr. Dulfo's phone and for Mr. Howard's

16   phone, and what we located was that on the date of the first

17   arson, July 2nd, Mr. Howard's phone was indicated to be in area

18   of Victim 2's residence at 3:12 AM on July 2nd of 2022 and

19   Mr. Dulfo's phone was indicated to be in the area of Victim 2's

20   residence at 3:26 AM, and the arson, of course, occurred at

21   3:27 AM.

22       And then, on August 12th of 2023, cell sites also put

23   Mr. Dulfo in the area of the second arson, but there are also

24   communications where Mr. Howard -- there was communication

25   where a text message from Mr. Dulfo stating, "Yo, I'm outside,"

1   on the date leading up to -- I think it was around midnight of

2   the day leading up to the -- the second arson on August 12th.

3         It should be noted that Mr. Howard's phone also

4   indicated that he was in the area around that time in the early

5   morning hours, but at the time of the arson, it appeared that

6   he was -- his phone was moving back up north to where he

7   resides.

8         We also had some Cash Apps for minor -- small amounts

9   of Cash App transactions that occurred between Mr. Dulfo's

10  account and Mr. Howard's account.

11        One moment.

12        We did take statements from the other two codefendants

13  in this matter, and they also inculpated Mr. Howard as

14  participating in the arson and stalking scheme.  Specifically,

15  that this defendant, Mr. Howard, recruited Mr. Etienne because

16  he was the connection that knew Mr. Etienne and recruited

17  Mr. Etienne to make money by performing the second arson as

18  well as the ramming of the Victim 1's vehicle.

19        THE COURT:  I'm sorry.  Mr. Dobbins, which codefendants

20  gave that information?

21        MR. DOBBINS:  Both, Your Honor.

22        THE COURT:  Both Mr. Dulfo and Mr. Etienne?

23        MR. DOBBINS:  Yes, Your Honor.

24        THE COURT:  Okay.  I know there's a related fourth

25  defendant, I think, from a different complaint?

```
 1          MR. DOBBINS:  That's correct, Your Honor.

 2          THE COURT:  Okay.

 3          MR. DOBBINS:  That -- that the defendant does not,

 4  based on their statements, did not -- their connection was

 5  through Mr. Dulfo.  They did not appear to know the other --

 6  Mr. Howard or Mr. Etienne.

 7          THE COURT:  Okay.  I'm sorry.  Anything further from

 8  your proffer, then?

 9          MR. DOBBINS:  No, Your Honor.  That's it.

10          THE COURT:  All right.  Ms. Blenman, would you like to

11  cross-examine Officer Rodriguez?

12          MS. BLENMAN:  Yes, please, Your Honor.

13          THE COURT:  Okay.  Officer Rodriguez, can you please

14  come forward.

15          Sir, can you remain standing and please raise your

16  right hand.

17  Thereupon,

18                  FBI OFFICER DARELL RODRIGUEZ,

19  having been first duly sworn or affirmed, was examined and

20  testified as follows:

21          THE WITNESS:  I do.

22          THE COURT:  Okay.  Please have a seat.

23          Okay.  Can you please state your name and spell it for

24  us.

25          THE WITNESS:  Darell Rodriguez, D-A-R-E-L-L,
```

1   R-O-D-R-I-G-U-E-Z.

2           THE COURT:  And you're a task force officer for the

3   FBI?

4           THE WITNESS:  Yes, Your Honor.

5           THE COURT:  Okay.  Did you hear Mr. Dobbins' proffer of

6   facts on behalf -- on your behalf?

7           THE WITNESS:  Yes, Your Honor.

8           THE COURT:  Do you have any corrections or changes to

9   that proffer?

10          THE WITNESS:  No, Your Honor.

11          THE COURT:  Okay.  Do you adopt that as your direct

12  testimony?

13          THE WITNESS:  Yes, Your Honor.

14          THE COURT:  Okay.  You may proceed with the

15  cross-examination.

16          MS. BLENMAN:  Thank you, Judge.

17                        CROSS-EXAMINATION

18  BY MS. BLENMAN:

19  Q.  Good morning, Officer.

20  A.  Good morning.

21  Q.  I want to ask you about your investigation as it relates

22  specifically to Mr. Howard.  Okay?

23  A.  Yes, ma'am.

24  Q.  Okay.  So I want to talk to you first about any

25  relationship between Mr. Howard and these victims first.  There

1   are essentially two victims, Victim 1 and Victim 2; right?

2   A.   Yes, ma'am.

3   Q.   And so just for ease, I will call Home Depot victim, I will

4   refer to "Home Depot Victim" and separately "Arson Victim."   Is

5   that okay?

6   A.   Yes, ma'am.

7   Q.   Let me ask as it relates to the Home Depot Victim, is there

8   any relationship your investigation has revealed between that

9   person and Mr. Howard?

10   A.   No, ma'am.

11   Q.   And when I say "any relationship," just so it's clear,

12   romantic?   Platonic?   Business?   Anything at all?

13   A.   No, ma'am.

14   Q.   Let me ask as it relates to Victim two, Arson Victim -- and

15   I understand that's sister and brother-in-law -- has your

16   investigation revealed any link between Mr. Howard and Victim

17   2?

18   A.   No, ma'am.

19   Q.   Same follow-up questions:   Any romantic, platonic, business

20   relationship between Mr. Howard and those individuals?

21   A.   No, ma'am.

22   Q.   As you're -- as it relates to your investigation, have you

23   determined any relationship between Victim 1, Victim 2, and any

24   of the codefendants?

25   A.   No, ma'am.

```
 1   Q.   I understand that Victim 1, Home Depot Victim, was coming
 2   home from some court proceeding as we heard in the proffer.
 3        Did that court proceeding have any connection to
 4   Mr. Howard?
 5   A.   No, ma'am.
 6   Q.   I want to ask you, moving on now, about certain specific
 7   moments.
 8        The first moment I want to talk to you about is the rental
 9   of the Home Depot truck.  Okay?
10   A.   Yes, ma'am.
11   Q.   And that truck was rented from some Home Depot facility;
12   right?
13   A.   Yes, ma'am.
14   Q.   And law enforcement was able to review surveillance from
15   that facility?
16   A.   Yes, ma'am.
17   Q.   And I understand from the proffer on -- from that
18   surveillance, there were points were law enforcement believes
19   certain codefendants were present at the Home Depot?
20   A.   Yes, ma'am.
21   Q.   Have you reviewed the surveillance footage?
22   A.   Yes, ma'am.
23   Q.   Okay.  As you review the surveillance footage, the footage
24   from Home Depot, is there any point where you see Mr. Howard
25   present?
```

1   A.   No, ma'am.

2   Q.   Is there any point where you see anybody consistent with

3   Mr. Howard's appearance present at the Home Depot?

4   A.   No, ma'am.

5   Q.   And to be clear:  This Home Depot truck -- it is not rented

6   by Mr. Howard; is it?

7   A.   No, ma'am.

8   Q.   Was law enforcement able to determine who it was that

9   rented the Home Depot truck?

10   A.   Yes, ma'am.

11   Q.   Does that person have any connection to Mr. Howard?

12   A.   Only from what we know or we were able to gather through

13   our investigation, there's a common link between the -- all the

14   codefendants.

15   Q.   Let me ask as it relates to the person who rented the Home

16   Depot truck, what, if any, connection, relationship did you

17   determine there to be to Mr. Howard?

18   A.   I don't know.  I don't have an answer for that, ma'am.

19   Q.   And when you say "you don't have answer for that," what

20   does that mean?

21   A.   I'm sure there's inquiries into their relation.  I'm just

22   -- I don't know the answer to that.

23   Q.   Okay.  So inquiries, some questions, but to this point, as

24   you sit here now, there 's been no -- I just want to make sure

25   I am clear there's been no established relationship between the

1   person who rented this Home Depot [sic] and Mr. Howard?

2   A.   Not that I'm aware of.  There may be some connection that's

3   part of the case file, but not that I'm aware of.

4   Q.   Okay.  I want to ask you about another moment, that moment

5   being the actual hit and run for Victim 1.  Okay?

6   A.   Yes, ma'am.

7   Q.   I understand that law enforcement obtained footage,

8   canvassed that area; is that right?

9   A.   Yes, ma'am.

10  Q.   And there was actual footage that law enforcement was able

11  to view?

12  A.   Yes, ma'am.

13  Q.   Have you yourself reviewed that footage?

14  A.   Yes, ma'am.

15  Q.   Okay.  As it relates to the footage obtained from the site

16  of the hit and run, is there any footage that depicts

17  Mr. Howard?

18  A.   No, ma'am.

19  Q.   And I just want to be clear:  When I say "depicts

20  Mr. Howard," I mean whether inside?  Outside of the rented

21  truck?  On the streets?  Anywhere in the vicinity?

22  A.   No, ma'am.  But to be clear:  There -- none of the

23  occupants in the vehicle exited the vehicle at any point during

24  the actual striking of the victim.

25  Q.   Okay.  Well, let me follow-up on that.

1      There is surveillance -- there's footage that law

2  enforcement obtained of the vehicle at some point making its

3  way from where it was rented to the site of the hit and run;

4  right?

5  A.   There's footage of the vehicle at the site of the hit and

6  run, ma'am.

7  Q.   Okay.  And what I understand, and correct me if I'm wrong,

8  is there's footage obtained separately and it will show as the

9  Home Depot truck traveled to the site of the hit and run, at a

10  certain point, one of the codefendants is observed as the

11  driver of Home Depot truck; is that right?

12  A.   That's correct, ma'am.  That's footage from the street, the

13  same street that the victim lives on.

14  Q.   Okay.  So one of the codefendant's observed in the vehicle

15  driving at the same street as the hit and run?

16  A.   Yes, ma'am.

17  Q.   And in that footage, is Mr. Howard depicted in any way?

18  A.   No.  There's only one that -- as far as we can see, there's

19  only one occupant in that truck at that time.

20  Q.   This Home Depot truck -- it was ultimately recovered; is

21  that right?

22  A.   Yes, ma'am.

23  Q.   When the Home Depot was recovered, was it processed in any

24  way for DNA fingerprints?

25  A.   Yes, ma'am.

1   Q.   What were the results of any processing done?

2   A.   I am not aware of the results, ma'am.

3   Q.   As I understand it, the Home Depot truck was recovered in

4   the vicinity of one of the codefendant's residences; is that

5   right?

6   A.   Yes, ma'am.

7   Q.   So not recovered in the vicinity of Mr. Howard's residence;

8   right?

9   A.   No, ma'am.

10  Q.   Another moment that I want to talk to you about is the

11  surveillance stalking of Victim 1, who is the victim of the hit

12  and run.

13      It's law enforcement's understanding that there was some

14  surveilling of this person before her vehicle was struck;

15  right?

16  A.   Yes, ma'am.

17  Q.   And that surveillance was conducted by -- or the

18  surveillance, the stalking of that individual allegedly was

19  conducted by somebody in a Silverado vehicle?

20  A.   We believe the Silverado is one of the individuals involved

21  in the stalking, yes, ma'am.

22  Q.   Okay.  Have you been able to determine who the Silverado is

23  registered or belongs to?

24  A.   Yes, ma'am.

25  Q.   Who's that?

1    A.   The codefendant Dulfo.

2    Q.   Okay.  I understand that at different points law

3    enforcement surveilled this Silverado and was able to observe

4    who was operating it; is that right?

5    A.   Yes, ma'am.

6    Q.   Who did law enforcement observe operating the Silverado?

7    A.   At the time of our surveillance, defendant or Codefendant

8    Dulfo was operating.

9    Q.   And when is it that law enforcement conducted surveillance?

10   A.   I don't know the specific date.

11   Q.   Was it once?  Multiple times?

12   A.   Multiple times.

13   Q.   Do you have -- could you give us any sense of how many

14   times, even a range?

15   A.   I couldn't put a number to it, ma'am.  It was multiple

16   times, multiple days, multiple agents.

17   Q.   And this is me just trying to get as close an estimate as I

18   can.  Would you say more or less ten times surveillance?

19   A.   I wouldn't be able to do that, ma'am.  I don't know.

20   Q.   At any point, as law enforcement conducted surveillance of

21   the Silverado, was Mr. Howard observed to be a driver of that

22   vehicle?

23   A.   Not that I'm aware of, ma'am, no.

24   Q.   At any point, as law enforcement conducted surveillance,

25   was Mr. Howard an occupant of the vehicle?

1    A.   Not that I'm aware of, no, ma'am.

2    Q.   I understand that there was a photo -- some appeared to be

3    Google maps recovered from a phone; is that right?

4    A.   Yes, ma'am.

5    Q.   Whose phone was that recovered from?

6    A.   Not the actual phone, but I know there were several items

7    of evidentiary value that were recovered from an iCloud return

8    that was served on the Defendant Dulfo's phone.

9    Q.   Let me ask:  Has there been any search of any iCloud or any

10   similar storage system as it relates to Mr. Howard?

11   A.   I believe they were in process of that now, ma'am.

12   Q.   Okay.  You know, as you sit here today, are aware of any

13   returns of evidentiary value on Mr. Howard's phone?

14   A.   Yes, ma'am.

15   Q.   Okay.  What would those be?

16   A.   Cell site, historical cell sites placing Mr. Howard at

17   several of the scenes involved in the crimes.

18   Q.   Anything else?

19   A.   No. No, ma'am.

20   Q.   Okay.  And when I say "anything else," just so it's clear,

21   I mean any photos, any messages, any Google searches, anything

22   along those lines apart from the cell site data you just

23   mentioned on Mr. Howard's device or storage system?

24   A.   As of today, not that I'm aware of.  It's part of the

25   investigation that's being worked on.

1   Q.   I believe we heard in the proffer about certain

2   communications between a codefendant and Mr. Howard -- between

3   Mr. Dulfo and Mr. Howard.  Apart from a text message referenced

4   in the complaint, are there contents of any other messages that

5   are relevant to this investigation?

6   A.   No content.  Just the toll records providing detailed call

7   logs between Mr. Howard and the codefendant Etienne.

8   Q.   And the toll records, meaning they simply show the existing

9   number of contacts; is that right?

10  A.   That's correct, ma'am.  Incoming, outgoing phone calls and

11  text messages with date and time stamps.

12  Q.   But you are not able to tell us the content of any of those

13  messages; is that right?

14  A.   No, ma'am.

15  Q.   Let me ask you about the arsons themselves.  I understand

16  those occurred on two dates; right?

17  A.   Yes, ma'am.

18  Q.   July 2nd, 2022, and August 12, 2023?

19  A.   Yes, ma'am.

20  Q.   Let me ask you about July 2, 2022.  Was law enforcement

21  able to recover any footage from that date?

22  A.   Yes, ma'am.

23  Q.   And that footage, I imagine, has been preserved; right?

24  A.   Yes, ma'am.

25  Q.   Could you describe the suspect or suspects that you see on

1    the footage from July 2nd, 2022?

2    A.   No, ma'am.

3    Q.   Why not?

4    A.   Just the vantage view of the video footage just depicts

5    what it looks like to be a male wearing dark clothing.  It

6    would be impossible for me to give you an accurate description

7    of who was there.

8    Q.   Okay.  And so leaving aside accuracy, just based on what

9    you can see on the footage, is there anything you can glean

10   other than it appears to be a male in dark clothing?

11   A.   No.  Just a male in dark clothing, yes, ma'am.

12   Q.   Okay.  Same question as it relates to August 12, 2023.  Is

13   there surveillance footage that is recovered from that date?

14   A.   Yes, ma'am.

15   Q.   What, if anything, can you tell us about the suspect or

16   suspects?

17   A.   A male wearing dark clothing, ma'am.

18   Q.   Anything apart from male, dark clothing, that you're able

19   to glean from August 12, 2023?

20   A.   No, ma'am.

21   Q.   We heard about certain Cash App transactions, and so I want

22   to ask you about those.

23        I understand the day of the hit and run, there are certain

24   transfers between the codefendants.  One is successful of $200;

25   right?

1    A.   Yes, ma'am.

2    Q.   And another attempted $800?

3    A.   Yes, ma'am.

4    Q.   Mr. Howard -- he was not a recipient or sender of either of

5    those transfers; is that right?

6    A.   No, ma'am.

7    Q.   There was a date, August 11th, Mr. Howard received $50 from

8    Mr. Dulfo; is that right?

9    A.   Yes, ma'am.

10   Q.   And that $50 -- that transaction, that's one of many.

11   They've exchanged money on different dates and different

12   points; right?

13   A.   I'm not aware of that information, ma'am.

14   Q.   Okay.  If it's in the complaint, though, you would agree

15   that's correct?

16   A.   That is correct.  That transaction is of significance

17   because of the date and time in which it occurred.

18   Q.   Let me ask you about Mr. Howard's arrest.  Tell me, where

19   was he arrested?

20   A.   I believe at his home or his mother's home.  I'm not sure,

21   ma'am.

22   Q.   Were you present for the arrest?

23   A.   No, ma'am.

24   Q.   Have you spoken to law enforcement about the circumstances

25   of the arrest?

1    A.   Yes, ma'am.

2    Q.   Okay.  Any indication that Mr. Howard resisted, ran,

3    fought, anything along those lines at arrest?

4    A.   Yes, ma'am.

5    Q.   What did you hear?

6    A.   Information that I received is Mr. Howard initially came

7    out once confronted by law enforcement -- or called out by law

8    enforcement.  Upon sight of marked law enforcement units, he

9    ran back into his house and made an attempt to exit out or flee

10   out the rear back -- the rear of the residence.  When he was

11   also confronted by law enforcement, who was out back, at which

12   point, Mr. Howard then went back into the residence and

13   barricaded himself.

14   Q.   In terms of the -- I'll use your word "barricading," how

15   long did that take?

16   A.   I don't know, ma'am.

17   Q.   Do you have any sense of whether it was minutes or hours

18   before Mr. Howard came out?

19   A.   I understand it was a considerable amount of time.  I

20   couldn't tell you exactly how -- how long. Long enough for

21   several flash grenades or flashbangs to be deployed to try to

22   get Mr. Howard to comply.

23   Q.   And in terms of -- I guess, at some point law enforcement

24   was able to get Mr. Howard under arrest; right?

25   A.   Yes, ma'am.

1  Q.   At that point, do you have any information about whether he

2  at that point resisted physically or otherwise?

3  A.   No, ma'am.

4  Q.   Was Mr. Howard interviewed?

5  A.   Yes, ma'am.

6  Q.   Was Miranda administered?

7  A.   He did not provide any statements.  I am not sure if it got

8  that far, ma'am.

9  Q.   Okay.  And I guess I'll say, then, the attempt of an

10  interview -- is that memorialized or recorded or any video?

11  A.   I -- I don't know that, ma'am.

12  Q.   Were you present?

13  A.   No, ma'am.

14  Q.   We heard about certain statements that the codefendants

15  made.  Let me ask:  Do these statements come before or after

16  their arrest?

17  A.   After arrest, yes, ma'am.

18  Q.   And the statements that's made by the codefendants, are

19  those recorded?

20  A.   Yes, ma'am.

21  Q.   Audio?  Video?  Do you know?

22  A.   Both.

23  Q.   Okay.  Let me ask:  As part of your investigation, did you

24  have occasion to look into Mr. Howard's criminal history?

25  A.   Yes, ma'am.

1    Q.   Okay.  You are aware Mr. Howard has no prior convictions;

2    is that right?

3    A.   Yes, ma'am.

4         MS. BLENMAN:  With the Court's brief indulgence.

5         THE COURT:  Sure.

6         MS. BLENMAN:  Thank you, Judge.

7         No further questions.

8         THE COURT:  Okay.  Thank you.

9         Any redirect from the Government, Mr. Dobbins?

10        MR. DOBBINS:  Yes, Your Honor.

11                      REDIRECT EXAMINATION

12   BY MR. DOBBINS:

13   Q.   Good morning, Task Force Officer Rodriguez.

14   A.   Good Morning.

15   Q.   At the time that there was -- that the arrest warrant was

16   served on Mr. Howard, was there also a search warrant that was

17   authorized for Mr. Howard's residence?

18   A.   Yes, sir.

19   Q.   And what was the target of the search warrant?  What were

20   some of things that were authorized to be seized?

21   A.   I believe instruments of the crime, the arson itself as

22   well as electronic devices, things of that sort.

23   Q.   Electronic devices were recovered such as cell phones from

24   that house?

25   A.   Yes, sir.

```
 1   Q.   And are they currently in the process of being searched?

 2   A.   Yes, sir.

 3   Q.   Okay.  In addition, you were asked on cross about your

 4   knowledge that Mr. Dulfo doesn't have any prior convictions.

 5        When you say, "No," are also aware, though, that Mr. Dulfo

 6   has had a couple of adjudications withheld?

 7   A.   Yes, sir.

 8   Q.   Sorry.  "Howard."  I apologize.  Mr. Howard.

 9        You talked about -- you were asked on cross about the

10   historical -- any evidence linking Mr. Howard's phones to the

11   crime.  You stated there were no communications but you had

12   cell sites and toll records.  Do you recall that?

13   A.   Yes, sir.

14   Q.   Okay.  So with the historical cell sites -- and you're

15   familiar with the complaint in this -- in this case; correct?

16   A.   Yes, sir.

17   Q.   All right.  So with the historical cell sites on the date

18   of the first arson, July 2nd, 2022, you're aware that

19   Mr. Howard's phone was in the general vicinity based on cell

20   tower records at approximately 3:12 AM, which is prior to the

21   arson which occurred at approximately 3:27 PM -- sorry, AM?

22   A.   Yes, sir.

23   Q.   And you're also aware that on the date of the second arson,

24   that there were indications that Mr. Howard was in the vicinity

25   prior to the arson a significant amount of time but still in
```

1  the early morning hours at that time?

2  A.  Yes, sir.

3  Q.  All right.  And also that Mr. Howard's phone indicated that

4  he was present in the area of the Coconut Grove Home Depot on

5  August 30th, 2023, on the date that was rented?

6  A.  Yes, sir.

7  Q.  And similarly, with the cell phone toll records, you said

8  that indicates what?  What kind of information does that convey

9  to you?

10 A.  Specifically, on the August -- significance on August 30th,

11 there was a high volume of calls being made between Mr. Howard

12 and Mr. Etienne before the incident occurred, leading up to the

13 incident, to include a lengthy phone conversation which

14 happened some time shortly after the incident happened.

15 Q.  Okay.  So the hit and run incident occurs, I believe, at

16 approximately 4:10 -- 4:12, I guess, PM; is that correct?

17 A.  Yes, sir.

18 Q.  All right.  And there's a series of phone calls between a

19 phone that was identified as belonging to Mr. Etienne and

20 Mr. Howard's phone.  Approximately 26 phone calls and 10 text

21 messages between 10:26 AM and 4:42 PM on that same day?

22 A.  Yes, sir.

23      MS. BLENMAN:  Objection, Your Honor.  It's kind of been

24 a string of leading questions, and I haven't objected

25 previously, but I'm objecting now.

1          THE COURT:  Well, why don't you rephrase your question,

2    Mr. Dobbins.

3    BY MR. DOBBINS:

4    Q.   When you talked about the -- you said it was a high volume.

5    Can you describe what the high volume was for the Court?

6    A.   Yes, sir.

7          It was approximately 20-odd numbers -- or phone calls that

8    were made between them starting from, like, 10:00 AM until

9    about 4:00 in the afternoon or shortly after the incident along

10   with some text messages.  I know when we further -- when he

11   looked further into the communications between Mr. Etienne and

12   Mr. Howard, it was determined that on that specific date,

13   August 30th, there was -- it was about 27 percent of the total

14   volume of calls between the two targets that were made on that

15   specific date; so that was of significance when we studied the

16   cell phone records.

17   Q.   Okay.  Now, going back to the arrest of Mr. Howard.  You

18   stated that -- you were asked on cross if he provided a

19   statement and you said he did not provide a statement; is that

20   correct?

21   A.   Correct.  Yes, sir.

22   Q.   And you said that -- when you were asked about whether or

23   not -- what the length of time was, you said that some devices

24   such as -- I think you used term "flashbangs" had to be

25   deployed.  Can you tell us what that means?

1    A.   Yes, sir.

2         It's a device deployed by, usually, our SWAT team to try to

3    gain compliance from a barricaded subject.

4    Q.   Okay.  And you said that initially that Mr. Howard was

5    called out.  Can you tell the Court what that meant.

6    A.   Yes, sir.

7         So initially upon approach, the standard procedure is to

8    set up around the house and make announcements from the outside

9    via a loud horn or some sort of speaker, getting the attention

10   of the occupants, and trying to gain compliance in that way.

11        Mr. Howard's name was called out multiple times, which

12   elicited other occupants in the house to step outside, and

13   that's when the interaction with Mr. Howard happened.

14   Q.   Okay.  And that's where he initially steps out, returns

15   inside, tries to go out the back, and then returns inside?

16   A.   That's correct.  Yes, sir.

17   Q.   And do you know at this time if any firearms were recovered

18   in the house?

19   A.   Yes, sir.

20   Q.   Okay.  And there was nothing illegal about anybody in the

21   house possessing those firearms; correct?

22   A.   Not that I'm aware of, no, sir.

23   Q.   But there were firearm that were recovered?

24   A.   Two.  Yes, sir.

25             MR. DOBBINS:  All right.  Nothing further, Your Honor.

```
 1              THE COURT:  Thank you, Mr. Dobbins.

 2              Okay.  Mr. Dobbins, any further evidence to present for

 3    the Government?

 4              MR. DOBBINS:  No, Your Honor.

 5              THE COURT:  Okay.  Officer Rodriguez, you can step

 6    down.

 7              THE WITNESS:  Thank you, Your Honor.

 8              THE COURT:  Ms. Blenman, first, regarding the pretrial

 9    services report, is there any changes that the defendant has to

10    the pretrial services report?

11              MS. BLENMAN:  No, Your Honor.

12              THE COURT:  Okay.

13              MS. BLENMAN:  Or -- I'm sorry.  I would note he wasn't

14    aware of the address initially, but I've confirmed with his

15    family, who is present, the address where he would reside and

16    does reside.

17              THE COURT:  Okay.  Do you have any -- with that

18    notation, any objection to the Court taking judicial notice of

19    the facts in the pretrial services report?

20              MS. BLENMAN:  No objection, Your Honor.

21              THE COURT:  Okay.  Does the defendant have any evidence

22    to proffer or present?

23              MS. BLENMAN:  No, Your Honor.

24              THE COURT:  Okay.  Then we'll proceed with argument.

25              Mr. Dobbins, what's the Government's argument for why
```

 1    there are no conditions or a combination of conditions that the

 2    Court could reasonably set to ensure the defendant's appearance

 3    or the safety of the community?

 4           MR. DOBBINS:  Yes, Your Honor.  I'll address first the

 5    flight first.  I would point out -- first, I would ask that the

 6    Court also incorporate the facts as stated in the complaint as

 7    well.

 8           But based on what we have here with risk of flight, I

 9    know that the defendant knows that he has no passport, but his

10    sister stated that he did travel to the Bahamas on a cruise a

11    few years ago.  I do note that he has significant family ties,

12    but I would also note that he indicates that he has been

13    smoking marijuana since 2007.  He has been arrested a number of

14    times and while he has no -- he has a couple of adjudications

15    withheld and several nolle pros, but I would point out that in

16    the March 23rd, 2009, case, which was possession of cannabis, a

17    capias warrant was issued for his arrest and was withdrawn

18    approximately three months later.

19           Again, we have in June -- the June 4th, 2012,

20    conviction on page 6, he was referred to pretrial diversion in

21    July.  That pretrial diversion was revoked in November of 2012.

22    And in the case of March 22nd of 2014, which was for a grand

23    theft, third-degree burglary of an unoccupied conveyance and

24    unauthorized possession of ID cards and credit card theft, on

25    October 17th of 2014, he failed to appear for a calendar call

1    hearing.  A capias warrant was issued.  It seems that he was

2    arrested on the capias warrant probably when he was arrested on

3    the loitering or prowling conviction, which is listed -- not

4    conviction -- yes, sorry, it is a conviction -- listed on

5    page 7.

6         And then he received at that point the adjudication

7    withheld on Counts I and II there, but again, that was another

8    case where he failed to appear for court and a warrant had to

9    issued for his arrest.

10        He also has one pretrial intervention completed for a

11   resisting an officer without violence.  So I would note that he

12   also has that as well as he's been arrested for resisting on

13   another occasion, although it was ultimately declined.

14        So given -- I do recognize that he has his family ties

15   to the community, but it seems that his -- it's unclear the

16   fact that he was living at the residence of his mother's since

17   October 2023.  It doesn't appear that he's been living there

18   very long.  He is employed, but given the facts of the case and

19   the length of time that he's potentially facing, I submit to

20   Your Honor that he is a risk of flight.  And, of course, he

21   doesn't have to run away or flee to another country to be a

22   risk of flight.

23        Obviously, many of our defendants tend to abscond and

24   hide even within our county, but they make it very difficult

25   for us to find them and they don't appear for court, and he has

1    a history of doing that.

2         Secondly, as to danger to the community -- I would note

3    the facts of this case.  I submit to Your Honor that the

4    evidence is strong.  We have the contacts as well as the

5    historical cell sites placing him in the area of two of the

6    three crimes.  Obviously, we have the -- we have the phone

7    messages.  We have the -- the giant increase in contacts

8    between this defendant and Mr. Etienne on the date of the hit

9    and run with the ramming with Home Depot, including a very

10   lengthy call after the incident occurred and at that same time,

11   shortly thereafter, we have payment for Mr. Dulfo to

12   Mr. Etienne through Cash App for the $200.

13        And then, we also have this defendant present in the

14   area of Victim 2's residence, which is nowhere near where this

15   defendant lives, in the early morning hours on the date of the

16   first arson at around the approximate time of the first arson

17   and, again, in the early morning hours prior to the second

18   arson as well as communications was Mr. Dulfo.

19        Given that we also had -- obviously, they were not

20   illegally possessed, but I would note that there were firearms

21   found in the house.  This defendant gives the risk of flight

22   and danger, appeared to not comply when he was called out to be

23   arrested, and it did require some use of force by the SWAT team

24   to get him to come out of the house so that they could arrest

25   him.

1    Currently, the investigation is ongoing and we still

2    have additional cell phones of this defendant that we are going

3    through.  And I would point out that Victim 1 and Victim 2 are

4    still in fear for their safety based on what we alleged the

5    actions of this defendant and his codefendants are in this

6    case.

7    So given that, we submit that there's no conditions

8    that could either protect the safety of the community and the

9    safety of Victim 1 and Victim 2 from the actions of this

10   defendant as well as the fact that he's a risk of flight.

11   THE COURT:  Mr. Dobbins, regarding the weight of the

12   evidence, so just to make sure I can understand what the

13   evidence is here, I mean, it's essentially, what I've seen is

14   his phone is in the vicinity of the first arson.  It's in the

15   area of the second arson some hours before -- before that --

16   before the actual arson takes place and is in contact with

17   Mr. Dulfo's phone that same morning, and Mr. Dulfo's phone was

18   at some point in the area of the second arson.

19   There's a high volume of contacts with Mr. Etienne on

20   the day of the hit and run.  And then there's Mr. Dulfo and

21   Mr. Etienne in post-arrest statements identifying Mr. Howard as

22   the one who recruited Mr. Etienne to perform the hit and run.

23   MR. DOBBINS:  And the second arson, Your Honor.

24   THE COURT:  And the second arson.

25   MR. DOBBINS:  And the other thing is that Mr. Dulfo's

```
 1    Silverado is actually observed on home security footage in the

 2    area of the second arson.

 3              THE COURT:  Right.

 4              MR. DOBBINS: Again, that takes place at approximately

 5    -- I just don't want to get my times wrong here, Judge.

 6              THE COURT:  Sure.

 7              MR. DOBBINS:  I apologize.

 8              THE COURT:  That's okay.

 9              MR. DOBBINS:  The second arson -- the first arson takes

10    place at approximately 3:26 AM.  The second arson takes place

11    at approximately 3:34 AM.  Mr. Howard's cell phone indicates

12    that he's in the area of Victim 2's residence in the early

13    morning hours prior to 3:34 AM, but at that point, he's still

14    -- it appears that he's moving further north, possibly on

15    Highway 95 at that time that the arson actually occurs, but

16    there's also the recovered text message from Mr. Dulfo to

17    Mr. Howard saying, "Yo, I'm outside," at approximately midnight

18    of that same day.  And --

19              THE COURT:  Is there any information about from

20    Mr. Dulfo -- where Mr. Dulfo was from his cell site when he

21    sent those messages?

22              In other words, is that sent from outside when -- is

23    there indication that by saying "I'm outside," that he's

24    referring to the arson location or someone's residence or

25    anything like that?
```

1        MR. DOBBINS:  I don't know if we have that information,

2   Your Honor.

3        THE COURT:  Okay.

4        MR. DOBBINS:  Yeah, so but that would be the case.

5   There's significant phone contacts between the two on each of

6   the dates that these incidents occur as well.

7        THE COURT:  Okay.  One question regarding the criminal

8   history.  It appears that you referenced in -- so you

9   referenced in 2010 he completed pretrial intervention.  That

10  was in connection with the resisting without violence.  That --

11  I take from "completed" meaning that it was successful.  He

12  completed without incident.  Are we essentially pretrial

13  diversion that was completed without incident?

14       MR. DOBBINS:  Yes, Your Honor.  The point of that --

15  the point of that was I was pointing out that what arrest was

16  for, that he entered pretrial intervention was a resisting

17  arrest --

18       THE COURT:  Okay.

19       MR. DOBBINS:  -- without violence.  But that one he did

20  successfully complete.

21       THE COURT:  And then in the 2012, in connection with

22  the possession of cannabis, the pretrial diversion is revoked

23  but the actual offense is ultimately nolle prosed?

24       MR. DOBBINS:  Right.  He doesn't suffer a conviction

25  from that.  It appears that a couple of months later the case

1    is nolle prosed, but again, my argument on that would be that

2    he's -- he was unsuccessful in completing the conditions of

3    court, which I think is a reflection of --

4         THE COURT:  Is there any indication of what the

5    revocation was based on?

6         MR. DOBBINS:  No, Your Honor.  I don't know the answer

7    to that, but I do know that it was revoked.  So...

8         THE COURT:  All right.  Any further then from the

9    Government?

10         MR. DOBBINS:  No, Your Honor.  I would just note also,

11    of course, again, there's a statutory rebuttable presumption in

12    this case.

13         THE COURT:  Okay.  Thank you, Mr. Dobbins.

14         Let me hear argument from the defense, and I guess

15    where I would like to start is where Mr. Dobbins ended.

16         Does the defense agree that -- that the charges do

17    carry a rebuttable presumption?

18         MS. BLENMAN:  I agree that they do carry that

19    presumption.  I would note, as a matter of law, the presumption

20    is easily rebuttable and I believe it has been rebutted here.

21         THE COURT:  Okay.  So explain to me how you rebut the

22    presumption, then?

23         MS. BLENMAN:  Sure, Judge.

24         So there are number of things that we've heard about

25    the evidence here and things that we know from the pretrial

1    services report about Mr. Howard that make out that he is not a

2    danger.  I will start with the pretrial services report, and

3    I'll note first, I did misspeak.  He does have a prior

4    conviction, my apologies, for loitering.  That was from 2014,

5    going on ten years ago, for a misdemeanor offense.

6         But what we see here, apart from that, he has no

7    convictions for any felony offense and he has successfully

8    completed PTI on a number of occasions.  Most recently, as of

9    January 2023, which goes to the fact that he can and does

10   follow conditions of court when given that opportunity.

11        We heard about two prior aliases that were issued.  I

12   would note as to the first, in 2009, that was withdrawn, which

13   is consistent with someone appearing in court, explaining to

14   the Court what happened, and that being set aside.  The most

15   recent capias we have is 2014.  Again, ten years ago.  That

16   case resolved with a withhold, and he certainly -- he's had

17   cases since then, though, no convictions, but cases since then

18   where he's appeared for court, where he's availed himself of

19   programming including PTI, and has successfully earned a

20   dismissal.  So I think that rebuts the presumption.

21        In terms of what we've heard about the case, there's no

22   question that the allegations here are serious, but I think it

23   is clear that the evidence as it relates to Mr. Howard is

24   significantly weaker than as it relates to the codefendant.  I

25   think it's worth parsing those, the evidence as it relates to

1    those two groups out, separately.

2         What we've heard as it relates to the codefendants is

3    that there's surveillance footage obtained at different points

4    at the Home Depot rental, on the block of the victim's

5    residence where she is -- where this hit and run occurs, and

6    that surveillance footage -- it shows the codefendants.  It

7    does not show at any point Mr. Howard.

8         We heard about significant money transfers.  Some

9    successful, some attempted between the codefendants around the

10   time of these incidents up to $1,000.  So there's 200

11   successfully sent, 800 that's attempted, not sent.  That does

12   not involve Mr. Howard.  We've heard as it relates to these

13   Cash App transactions there is one law enforcement flag because

14   of the date.  It is $50 that is sent to Mr. Howard.  That's not

15   consistent with any plan or carrying out of an arson or hit and

16   run.  I would note as well what we've heard from the agents,

17   that there are number of transactions between Mr. Howard.  They

18   flagged this one as suspicious because of the date, but the

19   amount tells us -- common sense, I think, tells us this is not

20   connected to an arson.

21        Apart from that, as it relates to the weight of the

22   evidence, there is surveillance footage.  At no point is

23   Mr. Howard observed on any footage as it relates to either of

24   these arsons.  We hear that a search was carried out at his

25   home and there are no physical items -- for example, the

```
 1    complaint references canisters presumably used to set fire.  No
 2    such physical that's recovered from his home.
 3            There's some indication that there's cell site data
 4    that places him generally in the area, which is the most that
 5    cell site data can do.  And we've heard on at least one
 6    occasion it's generally in the area hours before the arson and
 7    at the time of the arson, he is moving north.  So I think that
 8    as well -- the weight, the strength or lack thereof of the
 9    evidence -- also rebuts the presumption.
10            But the question is ultimately, and the presumption
11    doesn't change this, whether there are conditions that are
12    sufficient to address any concerns the Court might have about
13    danger and risk of flight.  I submit that there are, and what
14    our bond proposal is, it would be a $250,000 corporate surety
15    bond with a number of special conditions.
16            THE COURT:  I'm sorry.  You said a 250,000 corporate
17    surety bond?
18            MS. BLENMAN:  Personal surety bond, Your Honor.
19    Personal surety bond with conditions.
20            First, as cosigners, we would have M████ T████ and
21    B█ T█████    That is Mr. Howard's mom and dad.  They are
22    both present in court as are his brother and his sister seated
23    in the back row.  So I would ask that both parents be cosigners
24    on the bond.  We're asking --
25            THE COURT:  I'm sorry.  You said "both parents."  I
```

1   thought you were indicating his mother and brother would

2   cosign.

3           MS. BLENMAN:  Sorry, Your Honor.  We have present in

4   court Mom, Dad, Brother and Sister.  And I would be asking that

5   Mr. Howard's mom, M██████ T█████  and his dad, B███

6   T███████ --

7           THE COURT:  I'm sorry.

8           MS. BLENMAN: -- be cosigners on the bond.  I may have

9   misspoke.

10          THE COURT:  Okay.  No, I think I was confused by who

11  was who.  My fault.

12          MS. BLENMAN:  Apart from that, Your Honor, we are

13  asking for home confinement with electronic monitoring.  That

14  would mean Mr. Howard could not leave his home.  We are asking

15  for exceptions for legal, medical, work.  The pretrial services

16  report notes that Mr. Howard does have health concerns

17  including certain heart issues that he's been seeing a

18  specialist for and is trying to get clarity around.

19          The other conditions that I think would make sense

20  here, Your Honor, are a stay away order as to both victims.

21  And we've heard Mr. Howard -- we've heard this from the agent,

22  he has no relation to these individuals.  He has no reason to

23  contact them.  I think a stay away order makes sense.

24          And, finally -- and this would be generally a

25  condition -- that Mr. Howard has no access to firearms.  And I

1    have no question that his family would be willing to remove the

2    firearms from the home, and I would note, they were there

3    lawfully.  Nobody there is prohibited from having a firearm.

4          So those would be the conditions.  I spoke -- I spoke

5    to danger.  Based on Mr. Howard's limited single conviction and

6    the nature of his criminal history and that he's completed PTI,

7    I don't think that makes out a danger.

8          I've spoken to the allegations and the significant

9    disparity of evidence as it relates to Mr. Howard, which I

10    think cuts significantly in his favor.  To that, I would say

11    also, we've heard from the Government the investigation is

12    ongoing and they are reviewing, and that may very well be the

13    case, but what the Court can and must make its ruling based on

14    is the evidence that's been presented here.  And the evidence

15    as to Mr. Howard -- I think it's tenuous, at best.

16          So what I haven't addressed, and I think this can be

17    addressed quickly, because I don't think the Government should

18    prevail on this ground either, is serious risk of flight.  It

19    is not just risk of flight, but it would need to be serious.

20    Mr. Howard is a lifelong resident of South Florida -- born and

21    raised here.  He has four members of his family present, two of

22    which are willing, able to be cosigners.  We've talked about

23    the alias capiases.  One set aside, another case he did resolve

24    with a withhold.

25          I haven't spoken about the circumstances of his arrest.

```
 1    And at this point, having seen no discovery or anything along
 2    those lines, I think what we've heard is consistent with
 3    somebody who panics and makes a poor choice in that moment.
 4    But he's ultimately, taken into custody.  At the point that
 5    he's taken into custody, there's no physical resisting.  And
 6    what I'm asking for is an ankle monitor so the Court would know
 7    where he is at any given moment, and that would be monitored by
 8    probation.  Should he leave a residence when he's not supposed
 9    to, that could be immediately reported to the court.
10         And so we have him essentially, not on his best at the
11    time of his arrest, but well above and beyond circumstances
12    that would suggest he's not a serious risk of flight.  So for
13    all of those reasons, Your Honor, I would ask the Court to
14    consider the defense's proposed bond package, and Mr. Howard is
15    amenable, willing to any other conditions the Court might deem
16    appropriate.
17         THE COURT:  Okay.  Thank you, Ms. Blenman.
18         Any rebuttal from the Government specifically to
19    address the proposed conditions the defendant has put forward?
20         MR. DOBBINS:  Judge, I don't think that a personal
21    surety bond is appropriate in this matter even if it is
22    cosigned.  I don't know what the individuals are.  I mean, the
23    fact -- or nor a stay away order in this case because based on
24    -- based on what we know from this, that this defendant has
25    recruited others to participate in these crimes against Victim
```

1 and Victim 2.  So I don't think that just a simple home

detention or electronic monitoring resolves those -- those

issues.

MS. BLENMAN:  I apologize and I don't mean to

interject, I am just wondering if Mr. Howard can be seated.  He

takes certain medications and is feeling a little unwell at the

moment.

THE COURT:  As far as the marshals are okay with him

sitting over there, that's fine by me.

Sorry.  Mr. Dobbins, you were saying.

MR. DOBBINS:  So, again, I don't think that that

resolves the situation nor reduces the level of danger to the

community or to Victim 1 or Victim 2 in this case.  I don't

think that those conditions are sufficient to provide that.

And, you know, we can minimize or attempt to minimize the fact

that he has failed to appear on a couple of occasions, but, you

know, whether he had a good excuse or not, for the first one

really doesn't matter.  There still was a warrant issued for

his arrest.  And the second one, he was only, I submit, brought

back to the court because he was arrested on another offense,

which happened just prior to that.

So I don't think that -- I agree that he's a lifelong

resident of Miami-Dade County and he has significant family

ties here, but that doesn't mean that he's going to appear at

court.  He has a demonstrated history of not.

1          So I would submit, again, that a personal surety bond

2   would not be appropriate in this case nor would home detention

3   or electronic monitoring meet the conditions needed necessary

4   in this case to protect Victim 1, Victim 2, and the community

5   from this defendant and ensure his reappearance in court.

6          THE COURT:  Okay.  The Court must determine whether the

7   Government has met its burden of proving no condition or

8   combination of conditions would reasonably ensure the

9   defendant's appearance is required or the safety of the

10  community.

11         As to appearance in court, the Government's burden is

12  preponderance of the evidence, that is more likely than not.

13  As to danger to the community, the Government's burden is by

14  clear and convincing evidence.  That is evidence sufficient to

15  create an abiding conviction that future danger is highly

16  probable.

17         The Court must first assess the extent of any risk, and

18  then turn to whether any condition or combination of conditions

19  would reasonably mitigate that risk.

20         Now, I do find that based on the evidence we've heard,

21  there is probable cause to believe the defendant committed the

22  charged offenses.  That does create a rebuttable statutory

23  presumption that no condition or combination of conditions

24  would reasonably assure his appearance or the safety of the

25  community.

1    Regardless of this presumption, however, the Government

2    retains the burden of proving that detention is required, and

3    the presumption of evidence is to be considered along with the

4    other evidence in the record in determining whether the

5    Government has met its burden.

6        In assessing the risks of both nonappearance and

7    danger, I need to consider the factors found in 18 U.S.C.

8    3142(g), and I have considered those factors.  Based on my

9    consideration of the factors, I find the Government has not met

10   its burden -- and I'll explain -- why even despite the

11   presumption, which I have considered.

12       The nature of the offense.  As to -- I guess, let me

13   address danger and let me address risk of nonappearance, and

14   I'll do those separately.  As to danger, the nature of the

15   offense is obviously about one offense and is quite serious.

16   That does weigh in favor of detention.

17       What I find troublesome, though, is the weight of the

18   evidence.  I do think there's probable cause for the offense

19   and that does trigger the presumptions.  But I do agree with

20   the defendant that the evidence is far from overwhelming here.

21   There's circumstantial evidence placing the defendant in the

22   areas of the various incidents that were discussed and in

23   connection -- in communication with Mr. Dulfo and Mr. Etienne.

24   And probably the most significant evidence against him is the

25   post-arrest statements of his codefendants.

1          But the evidence is ultimately circumstantial, and I

2    think I have to consider the weight of that evidence in -- in

3    considering the extent to which the -- the evidence of this

4    incident is evidence of a danger to the community.

5          As to history and characteristics in terms of danger,

6    his criminal history is not extensive.  He does have some -- he

7    does have an adjudication withheld on burglary and the

8    conviction on loitering, but it's not a criminal history that

9    shows a propensity towards danger.

10          I am somewhat concerned by the failure to -- by the

11    behavior at the time of the arrest, but I don't think it's such

12    an indication of danger as to -- as to require detention.

13          As to risk of flight, the nature of the offense -- the

14    way the nature of the offense would play in terms of a risk of

15    nonappearance is that it does carry a rather significant

16    sentence as the Government has indicated, and that does create

17    a high incentive to flee; however, I do have to consider that

18    through also the weight of the evidence, which, as I've said,

19    is not overwhelming; so those somewhat counterbalance each

20    other.

21          In terms of his history and characteristics, the

22    Government has accurately indicated that there are some

23    concerns about nonappearance based on his failure to comply

24    with some pretrial -- pretrial diversion programs, and the one

25    incident where he did fail to appear at a calendar call and was

1    arrested.  The other capias, based on the fact that it was

2    withdrawn, I don't put much weight on.

3         However, in terms of a risk of nonappearance, he is a

4    lifelong resident of this community.  He does live with his

5    family members.  His parents are both willing to cosign on his

6    bond, and I do think that the electronic monitor is sufficient

7    to -- along with the home detention is sufficient to mitigate

8    the risk of a nonappearance at trial, at least reasonably to

9    mitigate it.  Is it an absolute guarantee?  It's not.  And

10   Mr. Dobbins is right about that.  But I do think it reasonably

11   assures his appearance at trial.

12        I am concerned about the potential for -- the fear of

13   the victims in this case.  I think that is something real and

14   something the Court does have to consider.  I think imposing

15   something like the no contact order is something the Court can

16   do.  Although, I do agree with Mr. Dobbins, I don't think that

17   carries a whole lot of weight here.

18        The thing I am struggling most, though, in considering

19   the danger to those victims is the Government has produced no

20   evidence of any connection between this defendant and those

21   victims and no evidence of motive as to -- for why these -- for

22   why the alleged offenses occurred.

23        Now, one could argue that actually indicates a greater

24   danger if someone is willing to participate in something like

25   this with, you know -- with no obvious reason.  But it also,

```
 1    given the lack of any connection between the victims and at

 2    least Mr. Howard, I -- it sort of begs the question as to what

 3    -- you know, what motivation or what extent or risk there would

 4    be of him taking additional steps against them while on

 5    release.

 6          Ultimately, while I do think it is a close question

 7    given the presumption, I don't think that detention is required

 8    in this case, and so I'm going to deny the Government's motion

 9    for detention.  I am going to impose the $250,000 personal

10    surety bond as described -- or proposed by the defendant and

11    impose additional conditions beyond that.

12          Is Mr. Howard able to come back to the lectern?  Are

13    you able to stand back up there, sir?

14          And, actually, before I address those conditions, could

15    I have his parents, M█████ and E██, please come forward.  Let

16    me start with his mother.

17          Ma'am, could you please state your name for the record.

18          MS. T████████   M█████   T████████

19          THE COURT:  Okay.  And, ma'am, you are Mr. Howard's

20    mother; is that correct?

21          MS. T███████   Yes.

22          THE COURT:  Your son's attorney proposed that I set a

23    bond that you would cosign on.

24          Your son lives with you; is that correct, ma'am?

25          MS. T███████   Yes, that's correct.
```

1          THE COURT:  And he's able to continue residing with

2     you; is that right?

3          MS. T█████████  Yes.

4          THE COURT:  If I impose this bond, one of the

5     requirements would be that you would cosign on the bond.  It's

6     a signature bond.  It doesn't require any collateral.  It's a

7     promise by your son that he's going to appear in court and

8     abide by all the conditions I set including a home detention

9     provision; however, if he were to violate that bond, based on

10    your co-signature, the Government could sue not only him but

11    also you for $250,000.

12          Do you understand that?

13          MS. T█████████  Yes, I understand.

14          THE COURT:  It also means that you wouldn't be able

15    encumber any property that you may own while he's on bond.

16    That means you wouldn't be able to sell or mortgage or anything

17    else.

18          Do you understand that?

19          MS. T█████████  Yes, I understand.

20          THE COURT:  Understanding that, are you still willing

21    to cosign on the bond for your son?

22          MS. T█████████  Yes, I am.

23          THE COURT:  Let me turn to his father.

24          Sir, can you state your name on the record, please.

25          MR. T█████████  E███  T█████████

```
 1          THE COURT:  Sir, are you Mr. Howard's father; is that
 2   correct?
 3          MR. T███████    Yes, I am.
 4          THE COURT:  Same questions that I asked -- I asked his
 5   mother.
 6          You understand that by cosigning on the bond, you would
 7   be open to the Government suing you for $250,000 in the event
 8   that he violated any of the conditions.
 9          Do you understand that?
10          MR. T███████    Yes, I do.
11          THE COURT:  And it would also prevent you from selling
12   or encumbering any real property you own.
13          Do you understand that?
14          MR. T███████    Yes, I do.
15          THE COURT:  Understanding that, are you still willing
16   to cosign on the bond?
17          MR. T███████    Yes, I am.
18          THE COURT:  Thank you both for your appearance today.
19   You can have a seat again.
20          Okay.  Mr. Howard, if you could come back.  So
21   Mr. Howard, as I've explained, this is a $250,000 personal
22   surety that will cosigned by your mother and father.  Again,
23   that doesn't require any collateral from you.  It's a promise
24   that you're going to abide the conditions that I impose.  If
25   you fail to abide by the conditions, there's some very serious
```

```
1    consequences.

2          First, a warrant would be issued for your arrest.  You

3    would be placed back in custody, and you would be held until

4    your trial.

5          Do you understand that?

6          THE DEFENDANT:  Yes, sir.

7          THE COURT:  Also, the Government could sue not only you

8    but also your mother and mother for $250,000.

9          Do you understand that?

10         THE DEFENDANT:  Yes, sir.

11         THE COURT:  That could mean their wages get garnished,

12   some property gets seized from them.  Those are very

13   substantial financial penalties that your mother and father

14   could suffer if you violate these conditions.

15         Do you understand that?

16         THE DEFENDANT:  Yes, sir.

17         THE COURT:  All right.  I am going to impose the

18   following standard and special conditions of bond.  Please

19   listen carefully.

20         First, you must appear in court as directed.  If you

21   fail to appear at any time when you're ordered to, not only

22   would you be rearrested and your parents sued for the amount of

23   the bond, you could also be separately prosecuted for the crime

24   of failing to appear or contempt of court.

25         Do you understand that?
```

```
1              THE DEFENDANT:  Yes, sir.

2              THE COURT:  Your travel is restricted to the Southern

3    District of Florida.  If you have any questions about the

4    boundaries of the district, please discuss it with your

5    attorney or your pretrial services officer.

6              You must reside at your current address with your

7    mother.  That is the address in the pretrial services report.

8              MS. BLENMAN:  I don't believe it's there, Your Honor.

9    I do have it.

10             THE COURT:  That's correct.

11             Can you please provide us with that address,

12   Ms. Blenman.

13             MS. BLENMAN:  Yes, Your Honor.

14             It is ███████████████████████████████████,

15   ████████████████

16             PRETRIAL SERVICES:  Your Honor, that address is on our

17   pretrial service report on page 2.

18             THE COURT:  It is?

19             PRETRIAL SERVICES:  It's confirmed.

20             THE COURT:  Thank you very much from pretrial services.

21             Sir, you must reside at that address.  You may not

22   reside anywhere else, and you may not change your address

23   without permission of the Court or pretrial services.  You must

24   cooperate with law enforcement in the collection of DNA, if

25   that's required.
```

1          While on bond, you must not violate any federal, State

2     or local law.  If you come in contact with law enforcement, you

3     must contact your pretrial services officer within 72 hours.

4          Do you understand that?

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  You are to surrender any passports or

7     travel documents that you own.  While on bond, you may not seek

8     to obtain any passports or travel documents.  You are to report

9     to pretrial services as directed.  You're to submit to

10     substance abuse testing or treatment if that's ordered by

11     pretrial services.  The cost of that will be borne by pretrial

12     services.

13          You are to maintain or actively seek full-time

14     employment.  You are to avoid all contact with any victims or

15     witnesses of this crime charged expect through counsel.  And

16     the Government will provide a list of any such persons to your

17     attorney so you know who that applies to.

18          Also you must avoid all contact with any codefendants

19     or defendants in related cases except through counsel, as

20     necessary, to prepare for your trial.  And, again, the

21     Government will provide a list of those people so you know who

22     that applies to.

23          While on bond, you may not possess any firearm,

24     destructive device, or any dangerous weapon.

25          Do you understand that?

```
 1              THE DEFENDANT:  Yes, sir.

 2              THE COURT:  Also, any firearms that are in the

 3      residence where you will be residing must be surrendered --

 4      must be removed from the house.  I'll give 24 hours for that to

 5      occur.  But no firearms should be in the residence regardless

 6      of who they belong to.

 7              Do you understand that?

 8              THE DEFENDANT:  Yes, sir.

 9              THE COURT:  While on bond, neither you nor any of the

10      cosigners may sell, pledge, mortgage, or otherwise encumber any

11      real property that you own.

12              I am going to place you on home detention enforced by

13      an active GPS monitor.  The exceptions to the home detention

14      will be for any medical visits, substance abuse treatment,

15      court appearances, attorney's visits, employment, or any other

16      activities that are pre-approved by your pretrial services

17      officer.

18              The cost of the monitoring will be borne by pretrial

19      services.

20              Are there any other conditions of bond that the

21      Government would recommend, Mr. Dobbins?

22              MR. DOBBINS:  I am sorry, Your Honor.  Just as to the

23      bond with the -- I didn't know if this defendant actually had

24      set hours, scheduled hours for work because I noted that you

25      put him on electronic monitoring but also allowed him to go to
```

```
 1    work.  So I don't know if he has those.  If he does, can he put

 2    those on the record?

 3              THE COURT:  Do we know what those hours are?

 4              MS. BLENMAN:  He does not have set hours.  He works,

 5    essentially on call, but given the requirements and the

 6    conditions the Court has set, my understanding is Mr. Howard

 7    would have to in advance provide a schedule to probation before

 8    he would be able to leave.

 9              THE COURT:  He would have to do that.  And I think that

10    I'm going to direct that any work hours will need to be during

11    the day time, and so the exception for employment, I would

12    restrict to between 9:00 AM and 5:00 PM.

13              MS. BLENMAN:  Understood, Your Honor.

14              THE COURT:  Mr. Dobbins, does that address --

15              MR. DOBBINS:  Yes, Your Honor.

16              THE COURT:  Anything else regarding the conditions of

17    bond, Mr. Dobbins?

18              MR. DOBBINS:  No, Your Honor.

19              THE COURT:  Is the Government asking me to -- does the

20    Government want to me to stay this order for the Government to

21    seek an appeal?

22              MR. DOBBINS:  Yes, Judge.  If we would get a stay.  If

23    we could get 48 hours or something like that.

24              THE COURT:  I can give you 24 hours.

25              MR. DOBBINS:  Okay.  If you could give us the 24-hour
```

1    stay.

2           THE COURT:  Sure.  I will stay it for 24 hours for the

3    Government to seek an appeal.

4           So that means -- that means, Mr. Howard, that you will

5    -- you can sign the bond today, but you will have to remain in

6    custody until that 24 hours is up.  If the Government decides

7    not to appeal, then you would be able to be released at that

8    point.  If the Government files an appeal, then it's up to the

9    duty district judge when they appeal, how that plays out.

10          Do you understand?

11          Any further issues regarding bond from the defendant?

12          MS. BLENMAN:  Nothing from the defendant.

13          THE COURT:  Anything from pretrial?

14          PRETRIAL SERVICES:  No, Your Honor.

15          THE COURT:  All right.  Then there are any other issues

16   that we need address regarding Mr. Howard then?  Mr. Dobbins?

17          MR. DOBBINS:  Nothing further, Your Honor.

18          MS. BLENMAN:  Nothing from the defense.  Thank you,

19   Judge.

20          THE COURT:  Okay.  Then, Mr. Howard, again, depending

21   on what happens regarding release, your next hearing is a

22   preliminary hearing or arraignment, that's scheduled for

23   March 22nd.

24          Let me also, I read the Brady order early, for this

25   case, Mr. Dobbins, you understand that it applies to this

```
 1   defendant as well; correct?

 2           MR. DOBBINS:  Yes, Your Honor.

 3           THE COURT:  And the same questions for the defense.

 4           You understand this order -- the Brady order applies in

 5   this case as well?

 6           MS. BLENMAN:  Yes, Judge.

 7           THE COURT:  And I will issue a written order to that

 8   effect.

 9           Then, again, if there's nothing else we need to

10   address, we'll stand in recess.  Thank you everyone for your

11   appearances today.

12           THE COURT DEPUTY:  All rise.

13           (Court adjourned.)

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2                         - - -

3                  C E R T I F I C A T E

4                         - - -

5

6   I, AMBER GABEL, Stenographic Reporter, State of Florida at

7   Large, certify that I was authorized to and did

8   stenographically report the foregoing proceedings and that the

9   transcript is a true and complete record of my stenographic

10  notes.

11

12          Dated this 15th day of March 2024.

13

14

15                      /s/ Amber Gabel

16          _____

17          AMBER GABEL, CR

18

19

20

21

22

23

24

25